IN THE UNITED DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

DARYL A. MARTIN                          *
5537 Cedonia Avenue
Baltimore, Maryland 21206                *

     Plaintiff                          *

v.                                       *       Civil Action No. _____

THE BALTIMORE CITY
POLICE DEPARTMENT
601 E. Fayette Street
Baltimore, Maryland 21202
County: Baltimore City, MD

WILLIAM HARRIS
c/o Baltimore Police Department
601 E. Fayette Street
Baltimore, Maryland 21202
County: Baltimore City, MD

ANTONIO RODRIGUEZ
c/o Baltimore Police Department
601 E. Fayette Street
Baltimore, Maryland 21202
County: Baltimore City, MD

SHAKIL MOSS
c/o Baltimore Police Department
601 E. Fayette Street
Baltimore, Maryland 21202
County: Baltimore City, MD

DEBORAH OWENS
c/o Baltimore Police Department
601 E. Fayette Street
Baltimore, Maryland 21202
County: Baltimore City, MD

LEONARD HAMM
*Last Known Address:*
c/o Baltimore Police Department
601 E. Fayette Street

Baltimore, Maryland 21202
County: Baltimore City, MD

JOHN DOE
*Unknown Police Officer*
c/o Baltimore Police Department
601 E. Fayette Street
Baltimore, Maryland 21202
County: *Unknown*

Defendants            *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, Daryl A. Martin, through his attorneys, Steven D. Silverman, Andrew C. White and Silverman, Thompson, Slutkin & White, hereby sues Sergeant William Harris, Officer Shakil Moss, Officer Antonio Rodriguez and Unknown Officer John Doe (hereinafter, the "Police Officers" and/or "Harris," "Moss," "Rodriguez" and "Doe"), Commissioner Leonard D. Hamm (hereinafter, "Hamm"), Colonel Deborah Owens (hereinafter, "Owens"), and The Baltimore City Police Department (hereinafter the "BPD"), and for his cause of action states as follows:

### I. INTRODUCTION

1.      The Plaintiff is a 34 year-old father of two, eight-year Navy veteran, who is currently employed in a management position with a national retailer.

2.      On April 26, 2006 at approximately 2:00pm, the Plaintiff, an African-American, was driving with a friend in Baltimore City.  The Plaintiff was on his way to be fitted for a custom-tailored suit for an event at the Engineers' Club, where he is a member.  Suddenly, without a warrant, probable cause or reasonable articulable

2

suspicion, and for no reason other than the color of his skin, the Plaintiff was pulled over by the Police Officers.

3.     In broad daylight, and in the presence of approximately thirty eyewitnesses, Harris and the officers under his supervision removed the Plaintiff from his vehicle under gunpoint, stripped him and forced a finger into his rectal cavity.

4.     This brutal attack on the Plaintiff was the culmination of the Police Officers' long-standing assault on the constitutional rights of the citizens of Baltimore City.  The Police Officers were permitted to engage in a rampage of widespread and persistent race-based, unjustified, unreasonable and illegal searches and seizures, excessive force and false reporting, completely undeterred by the BPD, Hamm or Owens.

5.     The Police Officers' attack on the Plaintiff was allowed to happen because the  BPD created a policy under which the Baltimore City police force was deficiently trained in that they gave their express and tacit authorizations to widespread and pervasive unconstitutional conduct by the Police Officers.   Furthermore, the BPD failed to adequately prohibit or discourage readily foreseeable unconstitutional conduct in light of the known exigencies of police duty.

6.     Additionally, the unconstitutional conduct of the Police Officers was so widespread and pervasive that it had assumed the quality of a "custom or usage" of the BPD, of which their policymakers had actual or constructive knowledge.  The BPD either specifically intended that this "custom or usage" continue, or were deliberately indifferent to stopping or correcting it.

7.     Hamm and Owens had actual or constructive knowledge of the widespread and persistent race-based, unjustified, unreasonable and illegal searches and seizures,

excessive force and false reporting by the Police Officers. Their response to this knowledge was so inadequate that it was allowed to continue and resulted in the brutal attack on the Plaintiff.

## II. JURISDICTION AND VENUE

8.     The jurisdiction of this Court is conferred by 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction is conferred by 28 U.S.C. § 1367.

9.     Venue is proper under 28 U.S.C. §1391 in that the Defendants and the Plaintiff reside, and the cause of action arises, in the Northern District of Maryland.

10.    The amount in controversy exceeds Seventy Five Thousand Dollars, excluding interests and costs.

## III. PARTIES

11.    Plaintiff is a 34 year old African-American man, a law abiding resident of Baltimore City, Maryland, and a United States citizen.

12.    Defendant Harris, at all times relevant to this Complaint was a sworn officer of the BPD,  acting under color of state law as a police officer of the City of Baltimore, Maryland and acting within the course and within the scope of his employment. He is sued in his individual and official capacities.

13.    Defendant Moss, at all times relevant to this Complaint was a sworn officer of the BPD,  acting under color of state law as a police officer of the City of Baltimore, and acting within the course and within the scope of his employment. He is sued in his individual and official capacities.

14.    Defendant Rodriguez, at all times relevant to this Complaint was a sworn officer of the BPD, acting under color of state law as a police officer of the City of

Baltimore, and acting within the course and within the scope of his employment.  He is sued in his individual and official capacities.

15.     Defendant John Doe, at all times relevant to this Complaint was a sworn officer of the BPD, acting under color of state law as a police officer of the City of Baltimore, and acting within the course and within the scope of his employment.  He is sued in his individual and official capacities.

16.     Defendant Hamm, at all times relevant to this Complaint was the duly appointed and acting police commissioner of the BPD, acting under color of state law and in the course of and within the scope of his employment.  He is sued in his individual and official capacities.

17.     Defendant Owens, at all times relevant to this Complaint was a Colonel in the BPD, acting under the color of state law and in the course of and within the scope of her employment.  She is sued in her individual and official capacities.

18.     Defendant BPD, at all times relevant to this Complaint was a municipality and a fully operational police department acting under color of state law.

## IV. FACTS

19.     On or about April 26, 2006, at approximately 1:45 p.m., the Plaintiff and his passenger, Brian Collins ("Mr. Collins") were traveling in a Buick Lucerne (the "Buick") in Baltimore City.  The Plaintiff and Collins were on their way to Collins' tailoring shop, where the Plaintiff was to be fitted for a custom-made suit.

20.     En route to the shop, the Buick was pulled over by a marked police car and an unmarked police car in the 900 block of Patterson Park Avenue in Baltimore City. Rodriguez and Doe were traveling in the marked car.  Moss, Shields and Harris were

traveling in the unmarked car. The marked car diagonally cut off the Buick's right-of-way, while the unmarked car blocked it from the rear, thereby "boxing in" the Buick.

21.     Rodriguez approached the Plaintiff and asked him for his license and registration. The Plaintiff provided the documents, as well as a proof of insurance card. The Plaintiff and Mr. Collins were at all times fully cooperative with the Officers and all of their documents were in order.

22.     Rodriguez ordered the Plaintiff and Mr. Collins to get out of the Buick and to stand on its driver's side. The Plaintiff and Mr. Collins did as they were told. Rodriguez then said to the Plaintiff, "He [Sgt. Harris] knows you." Upon information and belief, Rodriguez was referring to the fact that the Plaintiff and Harris "grew up" together and that the Plaintiff was close friends with Harris' cousin.

23.     Without requesting or being given the Plaintiff's permission, Harris began to search the Buick and asked the Plaintiff if he had any drugs or guns, to which the Plaintiff replied that he did not. Moss then began to frisk the Plaintiff, searching his groin area and grabbing his penis through his pants. By this time, scores of eye-witnesses had gathered to observe the interrogation and search.

24.     Throughout the interrogation and search, the Plaintiff repeatedly pleaded with the officers to tell him why he had been pulled over, but his questions were ignored.

25.     Following Moss' frisking of the Plaintiff, one of the officers produced a rubber glove from one of the police cars. Moss then donned the rubber glove and under gunpoint, forcibly lowered the Plaintiff's pants and underwear to his knees. To the Plaintiff's complete and utter horror, in broad daylight and in the presence if the gathered crowd, Moss forced a gloved finger into the Plaintiff's rectum.

26.    Moss, having found nothing during the cavity search, threw the glove to the ground and ordered the Plaintiff to pull his pants up. Harris mocked, "It wasn't that bad." Harris then picked up the Plaintiff's cell phone and asked, "You got any freak numbers in there?" Upon information and belief, Harris was asking if the Plaintiff knew any "loose women."

27.    Without ever giving the Plaintiff a reason for why he had been stopped, interrogated and searched, and without issuing any citations to either the Plaintiff or Mr. Collins, the officers sped away in the police cars.

28.    Although shocked and traumatized by the incident, the Plaintiff had the presence of mind to go directly to the Baltimore Police Department's Internal Investigation Division ("IID") to report the incident. There he met with a female officer and explained what had happened to him. Approximately an hour later, the Plaintiff received a phone call from IAD asking him where the rubber glove was. The Plaintiff informed the caller that the glove remained on the street where Officer Moss had thrown it. The rubber glove was recovered by an IAD unit.

29.    The glove was sent to the BPD's Biology/DNA Laboratory where vacuum samples from the glove were examined. These samples from the glove yielded a DNA profiles which matched the DNA profile of both Officer Moss and the Plaintiff.

30.    The Police Officers committed the aforementioned acts against the Plaintiff with the knowledge that they would be treated with impunity.

31.    At no time did the Plaintiff give his permission or consent to any of the Police Officers to interrogate him, search or seize his person or his personal belongings.

32.   At no time did Plaintiff provide any of the Police Officers with probable cause or any legal justification to interrogate him, search or seize his person or his personal belongings.

33.   The Police Officers did not possess any search warrant to search the Plaintiff's person or personal belongings, nor an arrest warrant to arrest the Plaintiff.

34.   The Police Officer's physical and mental abuse, and humiliating search of the Plaintiff and his personal belongings was unreasonable and unsupported by any legal justification.

## The Creation of the Special Enforcement Teams

35.   In July of 2005, Hamm, Owens, and the BPD created two Special Enforcement Teams (hereinafter, "SET") one to work on the east side of Baltimore City and one to work on the west side of Baltimore City.

36.   Each SET had about thirty officers who were organized into smaller units led by a sergeant.

37.   According to Hamm's 2005 Annual Report of the Police Department, "[a]t the direction of the Chief of Patrol this force was deployed in a rapid manner to respond to emerging violent crime problems throughout Baltimore.  In 2005, SET's East and Northwest teams alone affected [sic] over 7,000 arrests (the majority being drug and nuisance cases), seized 266 guns with 141 handgun violations...."

38.   Members of the SET units normally worked in plainclothes, and patrol in unmarked vehicles.

39.   The command structure regarding the SET units was different from other special units in the BPD.  Whereas other special units, such as flex squads, are managed

by and under the command of each of the nine police districts in the BPD and their commanders, the SET units were directly overseen by the Chief of Patrol, Owens.

40.    Hamm, Owens and/or other as yet unknown commanders, lieutenants, and supervisory officers within the BPD, acting on behalf of, under the auspices of and as agents, servants and/or employees of the BPD, supervised an east side SET unit (hereinafter, "east side SET"), to operate on the east side of Baltimore City, where Harris was a sergeant.

41.    For the east side SET, Harris was placed in a supervisory role in which he both participated in on-street police activities and oversaw the on-street police activities of several officers under his command, including, but not limited to, Moss, Rodriguez and Doe.

### The Egregious Misconduct Of, And Constitutional Violations Committed By The Police Officers and the Members of the East Side SET

42.    Hamm and Owens placed Harris in, and promoted him to, a supervisory role in the east side SET despite their actual or constructive knowledge that Harris had engaged in and was continuing to engage in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff.

43.    But one example of Harris' prior misconduct is set forth below:

In 1996, Albert McKoy ("McKoy") alleged that during an arrest Officers Curtis Calhoun ("Calhoun") and Harris subjected him to excessive force during the course of his arrest and that Harris directed discourteous comments toward him.  As a result of the interactions between McKoy, Harris and Calhoun, McKoy suffered a crushed eyeball which he claimed resulted from Calhoun's striking him in the eye.  Both Harris, who signed and/or completed the incident report, statement of probable cause and use of force report, and Calhoun, who completed a use of force report, wrote that McKoy lost his eye as a result of Harris, Calhoun and McKoy losing their balance and falling to the ground.  Specifically, Harris reported, "During the struggle to gain control of Mr. McKoy, these officers lost our

balance and fell to the ground with McKoy being on the bottom striking his head on the ground." During the Internal Investigation Division's (hereinafter, "IID") investigation into the matter, one of the paramedics reporting to the scene of the incident recalled looking for something on the ground around the complainant, but did not see any glass or broken bottles or anything which could have caused McKoy's injury. Any investigator or supervisor reviewing the investigation into McKoy's allegations of excessive force would have concluded that McKoy could not have lost his eye by falling in the manner described by Harris and Calhoun and therefore, that Harris and Calhoun falsely reported the incident. Nevertheless, the IID did not sustain the allegations of McKoy against Harris and Calhoun and thus, upon information and belief, the latter two were not subject to any sort of discipline.

44.    Additionally, Moss, Rodriguez, Doe and other members of the east side SET were engaged in egregious misconduct, and widespread and persistent violations of the constitutional rights of citizens under the jurisdiction of the BPD. This misconduct included, but was not limited to, random vehicle stops based on race, warrantless searches and seizures, planting of drugs and other evidence, warrantless entry into individuals' homes, perjury and falsification of Statements of Charges and other documents.

## The Statements of Charge

45.    Summaries of the SET's Statements of Charge ("Statements") are set forth below. These Statements provide compelling proof that the Police Officers' and the other SET members' constitutional violations were so widespread and persistent that Hamm and Owens had actual or constructive knowledge of them. Hamm's and Owens' response to this knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the conduct of the SET members and the Police Officers.

46.    Furthermore, the Statements provide compelling proof that the BPD created a policy under which the Baltimore City police force was deficiently trained, and

that the training policy deficiencies included express and tacit authorizations of unconstitutional conduct as well as failures to adequately prohibit or discourage readily foreseeable unconstitutional conduct in light of the known exigencies of police duty.

47.   In addition, the Statements provide compelling proof that the constitutional violations by the Police Officers were so widespread and persistent that they assumed the quality of a "custom or usage" of the BPD.  The BPD had actual or constructive knowledge of the "custom or usage," and either specifically intended that the "custom or usage" continue, or were deliberately indifferent to stopping or correcting the unconstitutional conduct.

48.   It is readily apparent on the face of the Statements that they were merely a ruse to cover up the Police Officers' and the other SET members' perjury, mishandling of evidence, planting of evidence and egregious violations of the Constitution and the laws of the State of Maryland.

49.   First, the Statements contain a similarity of "facts" so remarkable as to defy credulity.  Moreover, the Statements filed by the east side SET contain atypically high instances of:  alleged equipment violations as a basis for vehicular stops; "plain view" seizures of contraband in vehicles; intentional or accidental dropping or tossing of controlled dangerous substances by people; foot pursuit of people into residences; the post-arrest entry by eastside SET members into the residences of the arrestees and spontaneous confessions and/or incriminating statements made by people.

50.   The Statements also contain numerous claimed observations of suspects' suspicious actions which are impossible due to the officers' distance from the individuals, and/or darkness or other factors; numerous incidents of individuals being allowed,

undeterred by officers, to "dig" or place their hands in their pockets, an activity that a reasonable officer would have seen as highly dangerous, the majority of which resulted in contraband falling or dropping to the ground; and the reliance on "tips" and "information" from "confidential" and/or "confidential reliable sources," rather than registered informants.

51.    Finally, the sheer number of reported incidents of the serendipitous discovery of individuals possessing contraband simply cannot be possible.

52.    The only conclusion which can be drawn from the Statements is that Hamm, Owens, the BPD had actual or constructive knowledge of the Police Officers' and the SET's grave misconduct, and/or that the BPD created a policy under which the Police Officers were deficiently trained.

53.    For example:

    a.    <u>NATHANIEL GREEN</u>: On April 20, 2005, at 8:45 p.m., Officer Washington and members of the eastside SET were "traveling" and when they observed Green driving a Lexus with a "tinted front windshield." The emergency lights and siren were activated and the Lexus was stopped. As Washington got out of the patrol car, he noticed Green trying to "hide an unknown object." After Green handed over his license, he opened the center console to get his registration and Washington noticed in "plain view" two plastic baggies containing suspected marijuana. Green was asked to get out of the car due to the officer's concern for her safety. Once Green was out of the vehicle, the suspected marijuana was recovered and Green placed under arrest. An inventory of the Lexus recovered a tin can containing twenty-three vials containing suspected cocaine. On the passenger seat was a black case containing a handgun. Also in the console was a clear plastic bag containing suspected heroin. Ammunition was found in the trunk.

    b.    <u>FRANCIS JENKINS</u>: On June 1, 2005, at 12:45 p.m., Moss and Rodriguez received information from a "confidential source" regarding narcotics being dropped off to street distributors in the Findley Avenue area of northeast Baltimore. The supplier was described as black female driving a white Acura. Surveillance was

set up, and within 15 minutes, a white Acura pulled up and parked. The Acura was operated by a black female (Jenkins) fitting the description provided by the source. The officers approached the Acura and looked through driver's side window and saw the driver holding a clear plastic bag containing a large amount of white substance. Jenkins and her passenger were Mirandized and interviewed. An inventory of the the of the Acura produced a purse in backseat containing plastic bags each containing one ounce of suspected cocaine and a large plastic bag containing smaller bags of suspected marijuana. Also recovered was $442.00 and paperwork in the glove box with the name of Francis Jenkins and an address. Jenkins said she lived at that address by herself and was selling narcotics. She said there was additional money and cocaine at her home which the officers could keep if they let her go. Based on information received and items found, officers applied for a search and seizure warrant for Jenkins home, where officers recovered narcotics, street packaging and $6031.00.

c.  <u>JONATHAN ROYSTER</u>:  On July 21, 2005, at 9:20 p.m., officers Moss, Harris, Roles, Washington, Garner and Rodriguez were "traveling" when they saw a Toyota quickly pull over with a black male getting out of the car and running into a dwelling and the Toyota speeding away. The officers became concerned about the speed of the car and decided to pull it over to advise the driver (Royster). They caught up to the car and activated the emergency equipment when Royster "looked in the rearview mirror" and appeared to put something quickly into his mouth. The Toyota was pulled over and the officers approached. As the officers spoke with the driver, they "could clearly observe Royster having trouble attempting to swallow a large object in his mouth." Royster began to cough and the object "flew from his mouth and hit the passenger seat." The item was recovered and found to be a large Ziploc containing a large amount of rock substance. Royster exited the car and was stopped and placed under arrest.

d.  <u>ANWAR ROBINSON</u>:  On August 7, 2005, at 7:40 p.m., Preston, along with other members of the east side SET were "traveling" when they noticed a Buick with two occupants "not restrained by seat belts." The officers decided to pull the Buick over to advise the occupants of the importance of wearing seat belts. Emergency equipment was activated and the front passenger "looked in the officers' vehicle's direction" and "began to bend towards the floor." The Buick quickly pulled over and the officers quickly approached. The driver (Robinson) stated that he was giving the passenger (James Green) a ride and had nothing to do with the bag between his legs. The officers then became "fearful for their

safety," were asked to get out of car. As Robinson got out, a yellow top glass vial containing suspected cocaine "fell to the ground" and Robinson was arrested. When Green got out officers "saw a bag" on the front passenger side floor which was recovered and found to be a clear plastic bag containing four smaller bags with gel caps containing suspected heroin and two bags of suspected marijuana.

e.   <u>DURRONE GOINS</u>:  On August 23, 2005, at 7:30 p.m., Moss, Harris, Preston, Rodriguez and Roles were in the 3200 block of Jefferson Street when they observed a black Nissan pull to the curb with Goins exiting the passenger side. Several minutes later, a black male with a blue plastic bag approached Goins. The two shook hands and had a brief conversation. Goins took the blue plastic bag and pulled out what appeared to be a shoe box. Goins opened the box as if looking into it and got into the Nissan with driver (Tyler). Tyler then leaned over as if looking into the box. The black male then began to walk west at a rapid pace "looking up and down the street as if for police presence." The officers became suspicious and approached the subjects to investigate when the black male "looked in the officers' vehicle's direction" and began to run. The Officers approached the vehicle and observed Goins holding the open shoebox, in which the officers observed in "plain view" several clear plastic bags containing gel caps containing suspected heroin. The suspects were placed under arrest and the box was recovered. The unidentified black male who took off running was never located.

f.   <u>RONALD COX</u>: August 31, 2005, at 10:15 p.m., officers Preston, Roles and Rodriguez were "traveling" in the 400 block of N. Lakewood Avenue when they observed a black Lexus with "no front license plate." The officers pulled the Lexus over and approached it. The driver (Cox) rolled down the "heavily tinted window." For "officer safety," Cox was asked to roll down the other windows. When Cox rolled down the driver's side rear window, officers noticed in "plain view" on the backseat an open piece of newspaper containing plastic bags of suspected cocaine. Cox and the passenger were asked to exit and the bags were recovered. The officers found Cox's address and went to the residence and spoke to Cox's mother. Mrs. Cox told officers that they could look around her home for additional narcotics and voluntarily signed a consent to search form. Mrs. Cox then advised the officers that her son lived in the basement area and a Mr. Donte Tates pointed to the area where Mr. Cox stayed. Officers recovered $8000.00, heroin, cocaine and drug paraphernalia. (It should be noted that Cox stated that there were

no drugs in the back seat of his car, but admitted that they were in the trunk in tightly rolled up newspaper. He passed a polygraph on 7/24/2006. According to Cox, an officer asked permission to search car and was denied. The occupants were told to get out and the car was searched and nothing was found. Officer Rodriguez pulled trunk lever two times, and each time Cox prevented the trunk from opening. The other officers told him not to shut the trunk again and the trunk was opened on the third attempt and the officers found a rolled up and twisted newspaper containing cocaine and heroin.)

g.    <u>DURAND CARTER</u>: On August 31, 2005, at 4:30 p.m., Officers Moss and Harris "were in the area" and observed Carter exit a tan car and start walking toward 3016 E. Monument where a Terry Earl was waiting in the doorway with unknown amount of currency. "Durand Carter noticed we were police and took off running toward 3016." Officers apprehended Carter in the doorway and observed him "drop" a clear plastic Ziploc containing white substance in the hallway of 3016. Officers recovered the bag from the hallway and it contained numerous small bags of suspected cocaine, and a smaller bag containing eight bags of suspected cocaine and $132. Carter and Earl were both arrested. (It should be noted that Terry Earl testified under oath at a Motion to Suppress hearing that she was expecting Carter and that he came through the front door and then she heard a commotion. She saw Carter "being pulled back by a police officer by the back of his pants which caused the door to be slammed shut." Earl opened the door and asked the officers why they were there. She testified further that she did not invite the police into her house and objected to them coming in, and that she never saw any drugs recovered by the police. Earl testified further that she did put money on a table and that the officers took the money and never gave it back to her.

h.    <u>WESLEY GIBSON</u>: On September 8, 2005, at 10:00 p.m., Moss, Harris, and Roles were "traveling" and saw a black Cadillac with the front passenger (Devin Jackson) "not wearing a seatbelt." The officers decided to pull the car over to advise Jackson of the safety of wearing seatbelts. While officers were approaching the car, the driver (Gibson) and Jackson "moved around in the car and 'looked in the mirrors' as if for police presence." The officers went up to driver's side to get a registration. Gibson leaned over to open the glove box when the officers "clearly observed" two small plastic bags, each with suspected cocaine, in the ashtray. Gibson and Jackson were asked to get out and were placed under arrest. The center console also contained empty vials and tops and the officers

found six vials of suspected cocaine in Jackson's right front pocket.

i. <u>ALVIN WILLIAMS/TAVON ROBINSON</u>:   On September 12, 2005, at 3:10 p.m., Officers Preston and Rodriguez observed a green Chevy and noticed that the passenger (Robinson) was "not wearing a seatbelt." The lights were activated and the officers approached the Chevy. The officers noticed that Robinson and the driver (Williams) were attempting to hide an object under the driver's seat. The officers made contact with Williams and saw in "plain view" several yellow top vials on the front driver's side containing suspected cocaine.   Williams was asked to put the vehicle in park for "officer's safety," when he stepped on the gas and took off. Officers followed the vehicle for several blocks and advised dispatch to have additional units respond due to Williams' speed. Williams struck several parked cars. The suspects then got out of the vehicle and fled on foot. As Williams fled on foot, he "threw yellow top vials" containing suspected cocaine. The suspects were apprehended and taken back to scene. A search incident to arrest recovered six yellow-top vials of suspected cocaine, and $525.00 from Williams' pants.   Sixteen vials of suspected cocaine found in and outside car.

j. <u>THOMAS CRAWLEY</u>:   On September 24, 2005, at 8:15 p.m., Officers Moss, Harris, Preston, Rodriguez, Roles and Gardner were "traveling" on Preston Street and observed a burgundy Lexus with the driver "not secured by a safety belt."   The officers activated the lights to pull Lexus over to "advise the driver of the importance of safety belts."   The "driver looked in his rearview mirror and leaned toward the passenger side of the vehicle." The vehicle pulled over and officers approached. While speaking to the driver (Crawley), "officers could detect a strong odor of burnt marijuana coming from the vehicle."   When officers advised Crawley of the odor he "appeared to become nervous" and could not find his license or any type of picture ID. Crawley was asked to exit the car, and, "officers observed on the passenger side floor of the vehicle a white transparent bag which was tightly bound." The bag was recovered and contained five bags, each containing ten bags of suspected marijuana. Crawley was arrested. Officers responded to Crawley's residence and spoke with the owner, Tiffany Stinnet. Stinnet advised that Crawley did live there and allowed officers to look around by signing a consent to search form.   Looked around and found "in the basement ceiling" more suspected marijuana and $3003.00 and various papers in the name of Thomas Crawley.

k.    BERNARD KNITTS:  On October 7, 2005, at 9:00 p.m., Officers Moss, Preston, Roles and Shields were "traveling" when they observed a minivan with the "right rear tag light out," and pulled it over.  While approaching the car, officers observed the driver make a "quick hand motion with his right hand and then turn and look toward the rear of the vehicle 'as if for police presence.'" When getting to the driver's side window to obtain a license and registration, officers "observed on the passenger side floor Ziploc bag containing marijuana."  Knitts was arrested and police recovered the marijuana and from his right front pocket recovered rock substance, suspected cocaine, along with $353.00.

l.    MICHAEL MIDDLETON:  On October 30, 2005, at 8:20 p.m., Moss, Preston, Rodriguez and Washington "were traveling" and noticed a Nissan traveling at a "high rate of speed."  Officers decided to pull the car over to advise of the posted speed limit in the area.  The officers approached and the driver (Middleton) rolled down the window.  While speaking to Middleton, the officers used a "flashlight" to look through the rear window and "saw what appeared to be several bags of vial tops and glass vials commonly used to package suspected narcotics for street distribution."  Middleton said there was nothing else in the car and told the officers that "they could look in the car if they did not believe him."  Middleton got out, and "officers noticed in the rear of the car a mirror with white residue of suspected cocaine, a clear plastic bag which contained a large amount of rock substance, suspected cocaine."  Also found were several bags containing empty vials and tops used to package narcotics for street distribution.  Middleton was placed under arrest.  Officers located several pieces of mail for Middleton who stated that he lived at 1835 N. Collington Avenue with his mother.  Officers went to the house and spoke with mother who advised that they could look around her home and she completed a consent to search form.  The Mother showed officers where Middleton's room was and in the closet in a pair of sweatpants, they found a handgun, and ammunition.

m.    CRAIG KEMP/SEAN COZART:  On November 2, 2005 at 9:50 p.m. Moss, Preston, Shields, Rodriguez and Roles were "traveling" in the 500 block of Highland Avenue when they observed a Chrysler traveling at "a high rate of speed."  The officers became concerned and decided to pull the car over to advise of the speed limit.  Emergency lights were activated and the Chrysler's occupants began to "move about the vehicle."  The Chrysler was pulled over and Kemp and Cozart "appeared nervous."  Based on occupants' reactions when the lights were activated, they were

asked to exit the Chrysler. When Kemp got out, a small Phillips screw driver "fell to the ground." The officers became suspicious and called for K-9 unit to search for a weapon. The dog alerted the area of the console and the officers noticed that all of the screws to the console were missing except for one, which was loose. Officers used the recovered screw driver to open the console and recovered a .38 revolver loaded with five rounds. Cozart and Kemp were arrested. Upon information and belief, contrary to the statement filed by the officers, following their removal from the car, Kemp and Cozart were told to sit on the ground and remove their shoes and socks, at which point the screw driver fell to the ground. The evidence reveals that the gun was recovered from the console well before the call was made for the K-9 unit, because Rodriguez requested a complaint number for the gun violation before the canine unit arrived. Furthermore, upon information and belief, Harris placed the gun back in the console and he and Moss went to Mr. Kemp's residence with Mr. Kemp's keys in their possession. This is evidenced by a 911 call placed by Kemp's mother during which she complains that police are in her son's room. There is no official record of the officers going to or planning to go to Kemp's residence.

n.   <u>DAVID HARRIS</u>: On November 5, 2005, at 1:15 a.m., Rodriguez, Harris, Roles and Preston were "traveling" when they noticed a Ford truck going at a "high rate of speed." The Ford then pulled directly behind an SUV. Officers became concerned and pulled over the Ford to advise the driver (Harris) of the speed limit. Officers approached the Ford which had the window down. Harris "quickly turned his head 'as if the presence of the officers startled him.'" Officers then noticed in "plain view" what appeared to be Ziploc bags of suspected marijuana on top of the cup holder. Harris was asked to exit Ford and officers recovered two bags of marijuana. The Ford was searched and .357 revolver loaded with seven rounds was found in the center console. A black magnetic case containing gel caps containing suspected heroin was found in the cup holder. Also recovered was $2094.00.

o.   <u>DONNIE ADAMS</u>: On November 15, 2005 at 7:30 p.m., Officers Moss, Harris and other members of the SET were in the 1600 block of Wolfe Street, "known as a high narcotics area." Officers pulled into the area and observed Donnie Adams engaged in a brief conversation with and unknown male. "Mr. Adams looked in our direction and noticed the marked patrol car following behind our unmarked vehicle. He suddenly placed a brown paper bag underneath his jacket" and approached a silver Grand Marquis. Once at the car, Adams looked into it and got in on the front

passenger side.  The officers, suspicious of the Adams' activity, approached the vehicle.  While doing so, Moss observed Adams "toss a brown paper bag over to the driver side of the vehicle toward the driver (Cristal Eatom)."  There was a clear plastic bag in "plain view" hanging out of the brown bag which contained a green plant substance "when this officer approached the vehicle." Moss asked Eatom if the bag belonged to her.  She replied, "No, that is not mine it was not there a minute ago."  The bag was recovered and found to contain a little over a pound of suspected marijuana.  All suspects were arrested.

p.      ANDRE WILLIAMS:  On November 21, 2005, at 7:00 p.m., Harris, Moss, Shields, Rodriguez, Washington and Preston received information from a "confidential reliable source" that a subject named Dre was in possession of a large amount of cocaine and making drops around Dudley Avenue.  The source said Dre would be driving a white Jeep.  The Officers set up surveillance, and at 8:00 p.m., a white Jeep pulled into 3800 block of Dudley Avenue.  A male wearing a red jacket (Williams) exited the Jeep from the passenger side and was approached by a black male who pulled out U.S. currency and handed it to Williams.  Williams pulled out a large white object and handed it to the black male who drove off.  Williams got into the Jeep and gave the currency to the driver (Sean Hodges).  The Jeep headed toward Belair Road and the officers followed.  The Jeep pulled over and the officers approached it and identified themselves.  Hodges "tossed a large white object" toward the passenger side and it landed between Williams' legs.  The suspects were asked to exit the Jeep and the white item was recovered and found to be a large plastic bag containing a large amount of suspected cocaine.  Williams and Hodges were placed under arrest.

q.      KENNARD MILES:  On November 30, 2005 at 2:30 p.m., Harris, Moss and other eastside SET members were in the area of 400 N. Rose St., and area "known for its high narcotics activity."  The officers observed Larry Washington enter and exit 428 N. Rose several times after engaging in brief conversations with unknown males and females entering the block.  Officers approached Washington to investigate his activity and to find out if he lived at 428 N. Rose.  While attempting to do so, Washington dropped the bike he was riding and ran into the alley toward the rear of the house.  Harris ran behind him and observed him "throw" a clear plastic bag into the rear of 428 N. Rose.  As Harris was running by, he observed a black female (Cordeasa Jefferson) open the back door and grab the clear plastic bag."  Washington was apprehended and was being escorted back to 428 N. Rose.  Rodriguez had the

back secure.  While Harris was walking back with Washington to 428 N. Rose, he observed Miles trying to run out of the front of the house.  Harris left Washington and chased Miles up to the house and "Miles tried to close the door" in Harris' face.  The door was being held inside by Jefferson.  Jefferson and Washington were yelling "flush it."  Harris, hearing the comment and fearing the destruction of evidence forced the door open and ran straight upstairs where he "observed Miles flushing a large clear plastic bag containing gel caps containing suspected heroin."

r.    JAMES TUBMAN and DWAYNE MOORE:  On December 5, 2005, at 3:15 p.m., Moss and Rodriguez received information from a "confidential reliable source" that subjects were using 1141 N. Milton Ave to store and sell large amounts of suspected narcotics. After receiving this information, the officers set up to observe the area and saw two subjects (Tubman and Moore) in front of the N. Milton home.  A black female approached and the three had a conversation and then the black female handed money to Moore. Tubman "looked up and down the street as if for police presence" when he sat on the steps of the home.  Tubman then pushed the door open and produced a brown colored bag from and reached into it and pulled out a small item.  He placed the brown bag into the doorway.  He handed the small item to the black female who quickly walked away.  While observing the home, officers saw the scenario occur "approximately 3-more times."  Tubman would replace the bag in the doorway each time.  Based on these observations, the officers approached and Tubman and Moore "looked in officers' direction with surprised looks" and began to walk towards Biddle St.  Tubman and Moore were stopped and the officers recovered the brown bag from Tubman the bag he had been observed with.  It is noteworthy that the "statement of probable cause" indicates that Tubman replaced the bag in the doorway following each incident.  The statement does not state that Tubman retrieved the bag from the doorway when the officers approached and the suspects began to walk toward Biddle St., yet the bag is claimed to have been recovered from Tubman and not the doorway.

s.    JERROD JACKSON:  On December 7, 2005, at 4:30 p.m., Moss, Harris and other members of the east side SET were "in the area" and observed Jackson "grabbing his 'dip area' as if he had a gun," as officers approached.  Jackson was in standing on the side of the library.  As officers approached, Jackson "dropped a clear plastic bag" containing suspected marijuana by his foot.  The bag was recovered same and Jackson was arrested.  A search incident to Jackson's arrest recovered thirty-one bags of marijuana.  It should

be noted that this incident was falsely reported as a street encounter (Public Street) when it in fact resulted from a car stop, which was evidenced by a towed vehicle report indicating that vehicle was towed "due to driver being arrested for a narcotics violation." Upon information and belief, the officers informed Mr. Jackson that they had received a tip that a man in a green car might have a gun.

t.    ANTWAN MAGNUM:   On December 9, 2005, at 4:00 p.m., Moss, Harris, Shields and Washington "were conducting a narcotics investigation" in the 900 block of Madiera when they observed a male (Magnum, driver) and two females (Sharon Johnson, front passenger, Vernell Bartee, rear passenger) in a Dodge Intrepid.  Officers were in an unmarked car with a marked patrol car following behind.  The male and female were engaged in conversation with an unknown man dressed in dark clothing who had approached the vehicle.  The male outside the vehicle noticed the marked car and suddenly started walking in the opposite direction away from the vehicle.  "Officers becoming suspicious of his activity pulled down the block toward the Intrepid.  After pulling down the street close to the vehicle the driver stared looking around and dipped his shoulder as if he was placing something under the seat.  My training and experience led me to believe that the driver of the vehicle could be trying to conceal a weapon under the seat and this officer approached the vehicle and observed that the driver (Magnum) was handing a clear plastic bag containing small white objects to the passenger (Sharon) and dropped same in between the front seats of the vehicle where a blue jean purse was sitting."  Both suspects were secured and recovered one clear plastic bag containing twenty-six Ziploc bags containing suspected cocaine.   Magnum and Johnson were arrested.

u.    CRAIG WILSON:  On December 16, 2005, at 1:45 p.m., Moss, Harris and other east side SET members "were working" in the 400 block of N. Linwood Avenue when they observed a blue Ford van double parked in the block impeding the free flow of traffic.  Officers approached the van to advise the driver (Donte Simms) that he was impeding traffic.  Harris approached the driver and Moss approached the passenger (Wilson), when Moss noticed in plain view a brown hand rolled cigar containing suspected marijuana in between both passengers.  Both were placed under arrest.

v.    REGINALD BOYD On December 16, 2005, at 2:30 p.m., Moss, Harris and other east side SET members "were in the 400 N.

Linwood Avenue area" waiting for a wagon and a tow truck for an arrest they had just made. While waiting, a black Acura occupied by two black males approached. Moss was on the driver side of a green van conducting an inventory of the vehicle prior to towing. The Acura pulled up along side the van and this officer turned around to close the driver side door to prevent the Acura from striking the door. The driver (Boyd) was stopped in the street holding up traffic trying to talk with the vehicle behind him. "This officer walked over to the vehicle to advise Mr. Boyd that he could not hold up traffic. While doing so, this officer observed one clear bag containing green plant material (suspected marijuana) sitting between the driver and the passenger (Mouzon) on the middle console. "Moss got both suspects out and placed them under arrest. Conducted an inventory of the Acura while waiting for a tow truck. Found 66 plastic bags of suspected cocaine and three bags suspected marijuana and $210. It should be noted that the Wilson and Boyd incidents, which occurred not more than forty-five minutes apart, have nearly identical "facts" and circumstances: the officers are in the area, a car is obstructing traffic, officers approach and see marijuana "in plain view" in between the passenger and driver.

w.    KATIE GORRELL:  On December 23, 2005 at 8:10 p.m., Moss, Harris and other members east side SET "were in the area" when they observed a white Lincoln Navigator sitting on the side of the road "in a very dangerous location" with its hazards on. Officers activated their emergency lights to assist the driver. As Moss approached the passenger side, he observed the passenger (Todd Poorman) place a clear plastic bag containing an unknown number of gelcaps containing suspected heroin into his left pocket. Poorman was taken out of the car and "when he pulled his hand out of his pocket the clear plastic bag fell to the ground." The items were recovered and he and the driver were placed under arrest. Moss looked into the car and saw in the middle console in "plain view" a large bag containing white pills which he suspected to be Vicodin and a Ziploc containing pills suspected to be Valium.

x.    ROD ANDERSON:  On December 28, 2005, at 1:00pm, Moss, Harris, Shields, Harris, Rodriguez, Washington and Preston "were patrolling" and saw a green Chevy with "a brake light out." The officers turned on their lights and pulled Chevy over. Moss advised the driver (Anderson) of the problem and Anderson said that he had received a repair order on December 2, 2005. Anderson went to retrieve the order from his console at which time Moss observed a "crumpled cigarette pack with a clear plastic bag sticking out," containing suspected cocaine. Anderson retrieved

the repair order and gave it to Moss. Anderson and the passenger (Rouzer) asked to exit car and were arrested. Moss recovered the "cigarette pack from the console and same contained 1 clear plastic bag containing 10 green ziploc bags containing white rock substance, suspected cocaine, 1 blue plastic bag cont white rock substance, suspected cocaine and 6 clear plastic bag containing white rock substance, suspected cocaine." Note it does not seem possible that all of those bags and their contents could fit in a cigarette pack.

y.     PABLO SELBA:  On December 28, 2005, at 7:00 p.m., Moss, Preston, Washington, Rodriguez, Roles, Shields Officers were observing the 100 block of Decker St. due to several complaints that a Hispanic male was selling marijuana from the location. Moss observed a Hispanic male (Selba) in the doorway of the location and an unidentified black female approached Selba and they had a conversation. Moss observed the black female give Selba U.S. currency, and then observed Selba reach into his pants pocket and retrieve a clear plastic bag with suspected marijuana and give it to the black female. Believing that he had witnessed a drug deal, Moss and the other officers got out of their car and began to approach Selba to identify him and execute an arrest. Selba "observed this officer and ran into the house attempting to close the door behind him." Moss and other officers followed behind Selba, who proceeded into kitchen and down a flight of stairs into basement. Moss caught Selba in the basement. Moss arrested Selba and recovered a clear plastic bag of green plant like material from the front porch of 110 N. Decker which Selba dropped when he first saw Moss. In "plain view" in the basement on top of a mattress was another clear sandwich bag containing green plant like material and one brown rolled paper containing green plant material.

z.     HERMAN MILLER:  On January 6, 2006, Moss, Preston, Harris, Shields, Rodriguez and Washington observed Miller walking west on Chase Street when "he looked in these officers' direction with a surprised expression on his face." Miller then ran toward 2421 Chase when officers became suspicious and followed him. Miller entered 2421 Chase when "he tossed to the floor several items" which were recovered and found to be a box of empty glass vials and vial tops used to package drugs for street distribution. Officers noticed a subject (Tracey Hughes) seated at a table with two clear plastic bags containing suspected cocaine and a small digital scale in plain view. Both suspects arrested.

aa.   SARAH HOOKER and ROBERT MOORE:  On January 25, 2006, Moss, having "received information from a very reliable confidential" source regarding illegal narcotics being dropped off to street distributors on the east side, observed the subject approaching dealers on corners and engaging in short conversations.   Moss received additional information that the subject would be driving a gold Chrysler 300M and would be dropping off large quantities of narcotics in Collington/North Avenue area.  Moss and the east side SET setup surveillance in the area and a gold 300M pulled up and a young male got in.  The 300M started to leave the area and the officers observed it for 2-3 minutes and the officer initiated a car stop based on the observation that young male was "not wearing his seatbelt."  Moss saw driver (Moore) stick a clear plastic bag containing an unknown number of vials into his coat.   Moore was removed from the car and stated that he did not have a license when asked for ID.  "Robert Moore was still moving around and trying to get into his front coat pocket," and when he pulled his hand out, a clear plastic bag containing vials "fell to the ground."  Moore was Mirandized and placed under arrest and his home searched pursuant to a warrant.

bb.   TYRONE A. THOMAS:  On February 3, 2006, Shields, Moss, Washington, Roles, Mazzoni and Smith "observed a tan Buick with a brake light out" and decided to advise the driver.  The driver (Thomas) "appeared to look in the rearview mirror as he continued on Hillen Road."  The officers turned on the siren and Thomas continued to drive, but then pulled over.  As the officers approached the car, Thomas stepped out and began to walk toward the officers.  Thomas was told to get back in the car, and as he walked back, a "large object fell to the ground from his right pants leg."  Thomas got back into the car and officers recovered the item, which was found to be a rubber band around a clear plastic bag containing eight clear plastic bags containing suspected cocaine, along with eight Ziploc bags each containing a rock substance.  Thomas was arrested.

cc.   EUGENE MCCALLUM:  On February 7, 2005, Moss and other east side SET members "were driving eastbound on Broadway" when they observed a silver Malibu sitting on the side of the road near the rear of the Courthouse parking lot.  The officers pulled behind the Malibu because they "could not get around it."  Moss approached from the passenger side, while other members of the eastside team approached from the driver's side.  As Moss arrived at the passenger side, he observed McCallum place a black package into his right front jacket pocket.  Moss, "being familiar

with the shape, size and packaging of street level narcotics ... believed that the suspect was trying to hide illegal narcotics." McCallum was removed from the car after refusing several times to get out and show his hands. "Once out of the vehicle and his hand was removed from his jacket in fear that he was in possession of a weapon a black bag containing several jugs fell to the ground." The bag was found to contain jugs and gel caps containing suspected cocaine, various packaging material and a firearm. "Mr. McCallum advised these officers where he was staying and that there was a handgun at the location with his pregnant girlfriend." Officers responded and spoke with girlfriend Tennell Washington "advising her of the situation." Washington advised the officers to remove the handgun and any other contraband in the apartment for the safety of her two baby girls in the house. After signing consent to search form the officers removed a firearm.

dd.    <u>JOHNNIE TOOMER</u>:  On February 8, 2006, at 12:00 p.m., Moss and other members of the east side SET "who were in the area" observed a vehicle pull over to the side of the road after two black males flagged it down. Moss approached the car with the black males standing outside of it because, "the vehicle did not appear to work for a registered sedan service." The officers asked Toomer if he had ID. While he was "digging in his pocket," an orange plastic Ziploc containing suspected cocaine "fell to the ground" from his left pants leg.

ee.    <u>JAMES THOMPSON</u>:  On February 9, 2006, Harris, Shields, Washington, Rodriguez, Smith and Mazzoni observed a tan Cadillac parked on 21st street. Earlier that day, officers had received information from "a confidential reliable source" that a car fitting this description was dropping off cocaine for distribution. Thompson exited the Cadillac, "looked in the direction of the officers and ran off with a surprised expression," leaving the door open. Officers followed Thompson, who looked behind several times while being pursued. Officers saw him "toss" a light colored item into a yard, which was recovered and found to be rock cocaine. Thompson was caught and placed under arrest.

ff.    <u>ROBERT WOODS</u>:  On February 24, 2006, Harris, Moss, Shields and Washington were "traveling" and observed a car with its passenger "side brake light out." They decided to pull the car over to advise of the problem. The officers activated their lights when the car pulled over "with the occupants looking in the officers' direction." As the officers approached the car the passenger (Woods) opened his door and began to step out. "Officers then

noticed Woods make a quick hand motion with a large item falling to the ground." Woods was stopped and the item found to be a clear plastic bag containing suspected heroin. Woods was placed under arrest. Note that the car had been rented that morning and it is doubtful that it would have a brake light out.

gg.   ANTONIO JACKSON:  On March 2, 2006, Harris, Washington, Roles, Mazzoni and Conklin observed Jackson exit a location on the 500 block of Linwood Avenue. Jackson began to walk up Linwood when he turned to look in the direction of the marked patrol car. Jackson began to walk faster as officers continued up the street. As officers began to pass Jackson they stopped the car and Jackson started to run. The officers followed Jackson and observed him "toss to the ground" an object later determined to be two plastic bags containing suspected marijuana. The officers continued to follow and he ran to the steps of 521 Linwood, he opened the door and "attempted to slam same on officers but was unsuccessful." Officers noticed several subjects in the home. Officers continued after him and he opened the rear door and attempted to exit. Jackson ran into the rear yard and when officers "noticed him toss an object" which was recovered and found to contain five gel caps containing suspected heroin. Jackson finally arrested and "blurted out that he lived at the house and the subjects inside had nothing to do with it." Officers who stayed in the house went to the second floor and smelled a strong odor of burnt marijuana. Officers entered the front room and noticed a stronger odor of marijuana with several subjects inside. Several people and two small children were on the first floor. All of subjects were secured on the first floor when Jackson stated to the officers "I got what ever you find in the house." Found in the basement on the bed were controlled dangerous substances, scales, sifters and other paraphernalia. Items brought to the first floor and Jackson said to the people in the house "Don't worry, I told them it's all mine."

hh.   GREGORY ROOKS:  On March 3, 2006, Moss, Harris and other members of the eastside SET were conducting a narcotics investigation when they noticed a car with "a tail light out." The driver (Rooks) was stopped to advise him of the light. Rooks was asked for his license and he pulled three out of his wallet, two from Maryland and one from Pennsylvania. One of the officers noticed that Rooks was "trying to hide an object on the side of his leg near the middle console." The officer immediately thinking it was a weapon removed Rooks and observed two clear plastic bags containing white a rock substance suspected to be cocaine sitting on the driver's seat.

ii.　　**TYRONE BAILEY**:　On March 7, 2006, Moss, Harris and other east side SET members noticed a green Cadillac "with a tail light out" and pulled it over.　Once the car was stopped, Moss noticed the driver (Bailey) trying to hide a brown paper bag between the driver's side door and his left leg.　Bailey could not provide a license or registration.　Moss asked Bailey to step out of the car, and while he was "attempting to get out after hesitating a brown paper bag containing 158 blue top jugs containing a white rock substance fell to the ground."　Bailey was arrested and recovered from the ground were bags containing jugs of suspected cocaine. Upon information and belief, the tail lights were working properly at the impound lot and the car had been picked up that morning after the installation of two rear tail lights.

jj.　　**ANDRE MILLS**:　On March 10, 2006, Moss and members of SET were "patrolling North Avenue" and noticed a car "with a tail light out."　The emergency lights and were activated and the officers attempted to pull the car over.　The car did not stop and appeared to be trying to pull away but could not due to heavy traffic.　On approach to the vehicle, one of the officers noticed the driver (Mills) making "furtive movement" in the vehicle.　While at the drivers' window, Moss noticed that the console was propped open by the handle of a handgun.　Mills was secured and Moss returned to the vehicle and retrieved a handgun with one magazine and six live rounds.　Upon information and belief, the tail lights were found to be working properly at the impound lot.

kk.　　**KEITH T. EADES**:　On March 11, 2006, Conklin and other members of the eastside SET observed a silver Mercury with "its tail light out."　The officers activated their lights and siren and stopped the Mercury.　Conklin asked the driver (Eades) for his license.　As Eades reached for his license Conklin observed in the front ashtray a clear plastic bag containing a rock like substance, suspected cocaine.　Conklin asked the other members of the SET unit to ask Eades to exit the car.　Conklin recovered the bag which contained eight clear plastic bags containing a rock like substance from the ashtray.　Eades was placed under arrest and $162.00 was recovered.　"As Mr. Eades was placed inside the transport vehicle Mr. Eades stated to this ofc that he had more narcotics at his home."　Officers went to his home and were met by a Richard Howard who signed a Baltimore City consent to search form.　He then led the officers to Eades' room where officers recovered a Ziploc containing suspected marijuana, packing material, clear plastic bag containing 23 suspected ecstasy pills, black scale with white residue and $2010.

ll.     GLEN CRAIG:  On March 17, 2006 at 4:00 p.m., Shields and
        other members of the east side SET received information from a
        "confidential source" that two older males in a blue Buick were
        making drops in the Erdman Avenue shopping center. Officers set
        up surveillance and a blue Buick pulled into the area and parked.
        Two subjects, Glen Craig and Tarik Tynes got out of the Buick.
        Craig and Tynes looked in the direction of the officers who
        identified themselves. Tynes tossed a clear plastic bag containing
        suspected cocaine to the ground. Suspects were arrested and
        officers went back to the car.

mm.    DERIC FORD:  On March 19, 2006, Harris, Moss and Shields
        received information "from a confidential source that a subject
        living at 235 N. Lakewood Avenue was storing large amounts of
        narcotics namely cocaine and heroin inside the location.  The
        source also advised that the location was storing guns." Set up on
        the location to "make observations" when three subjects left the
        location and entered a white Chrysler, which officers attempted to
        follow. Officers were eluded and returned to 235 Lakewood to
        make observations. Chrysler returned one hour later with subjects
        exiting the Chrysler and "driver (Ford) going to the trunk removing
        a dark metal object." Officers decided to approach the subjects
        and identify them. Officers approached and identified themselves
        as officers. "Officers explained their reasons for stopping them
        when Ford said he lived at the location with his mother and
        brothers." When asked about the black metal box, Ford "became
        nervous and advised officers he was holding something for a
        friend." "Ford then accompanied the officers into the location
        when he retrieved the metal box turning same over to officers."
        Ford then provided a key and then opened the box and officers
        observed five clear plastics bags each containing a large amount of
        suspected cocaine; one clear plastic bag containing 170 gel caps
        suspected heroin; handgun, revolver and $400.   Subjects all
        detained and Ford interviewed. Ford "voluntarily advised officers
        that he would cooperate and turn over his friend who was a large
        scale provider of narcotics on the east side of Baltimore City."
        Officers released subjects pending further investigation.

nn.     STEVEN WILLIAMS:  On March 24, 2006 at 9:00 p.m., Shields,
        Washington, Mazzoni and Roles were traveling on Pulaski
        Highway and observed a blue car pass them at a high rate of speed
        and did not slow down after passing a marked patrol car. Officers
        attempted to catch up to the car to advise driver (Marvin Sanders)
        of posted speed limit. Emergency equipment was activated and the
        passenger (Williams) "looked in the direction of the Officer's
        vehicle." "Williams then appeared to move inside the vehicle," as

the driver "appeared to look in the rearview mirror." The two subjects "appeared to be speaking to each other" when the vehicle pulled to the curb "when the driver's door and passenger door to the vehicle came open" with the subjects "attempting to exit the vehicle." As officers approached the vehicle looking inside the open passenger side door, "officers then noticed protruding from under the passenger seat was 1-clear plastic bag" containing suspected cocaine. Officers went to recover the bag when they "noticed two additional clear bags" containing yellow vials of suspected cocaine. Sanders was placed under arrest without incident. Williams struggled when arrest was attempted and a handgun was found in his waistband.

oo.    <u>KAREEM KAMONTE</u>: On March 24, 2006 Washington, Harris and Shields were on patrol when they observed a white Acura "with the passenger side mirror broken." Officers conducted a car stop and while they approached the car Washington observed the driver (Kamonte) "moving around and attempting to shove an unknown object in his pants." "For officer safety," Kamonte was asked to step out, and as he did "a large clear plastic bag containing blue pills (suspected ecstasy) fell to the ground." Kamonte was arrested.

pp.    <u>RONALD OFFER</u>: On March 30, 2006, Shields and other SET members noticed a large group of men and women loitering on the corner of Curley and Jefferson St. The group was told to disperse because they were blocking traffic. After turning a corner, Shields and Moss saw two BMs (Offer and Lipscomb). Mr. Offer looked up and down the street "for police presence" while Mr. Lipscomb walked to a sewer drain and picked up a clear plastic bag with gelatin capsules inside and put it in his left pants pocket. Shields and Moss were seen by Offer and Lipscomb and began walking in the opposite direction. Both were arrested and officers recovered bag from Lipscomb containing 16 gel caps filled with suspected heroin.

qq.    <u>HENRY BAKER and TIFFANY BYERS</u>: March 31, 2006 during the fourth week of March, Moss received information "from a reliable confidential source" that 219 N. Howard St. was being used to supply large amounts of cocaine to street dealers on east side. The source identified a bluish BMW 745 with a light skinned black male with braids. The source advised that the subject would only go to the location to make a deal or restock the location for future deals. After receiving the information, Moss and the source went to 219 to observe. Surveillance was set up. During the fourth week of March, while the building was under surveillance, a

dark truck approached the location. The driver, a brown-skinned male approached the building and entered with a key. Subject left after 10 minutes, carrying brown shopping bag, locked the door and drove off. Officers followed the car to a storage facility in Northern Baltimore. The subject got out of car with paper bag and went into storage facility. Left in his car after 20 minutes, without the bag. Surveillance discontinued due to traffic. On March 31, 2006, officers were watching the location when a dark BMW pulled up. The driver, a light skinned black male (Baker), left the BMW and approached 219. He walked up to the side entrance and opened the door with keys. He stayed for 15 minutes and left carrying a large bag. Moss believed him to be the person described by the informant and approached him. Baker looked toward the officer and attempted to reenter the building. Officers followed him as he attempted to run up the stairs. As he was running, he "dropped the bag and a large brick shaped item fell out and down the stairs." Baker was stopped and arrested.

rr.    KAREEM MORGAN: On April 12, 2006 Officer Washington and members of the SET were on patrol and observed a Jeep "with a brake light out." They activated their unmarked vehicle's lights and stopped the Jeep. Officer Washington got out and approached driver (Morgan) and advised him of the reason for the stop and asked for his license and registration. Officer Washington claims to have noticed the strong smell of marijuana coming from the vehicle and believed Morgan to be in possession of narcotics and asked him to step out of the car. As Morgan stepped out, officer noticed 2 clear plastic bags containing blue pills suspected ecstasy "in clear view in a cup holder." Morgan placed under arrest.

ss.    DAVID ORR: During the second week of April, 2006, members of the east side SET received information from a "confidential reliable source" that someone known as "DJ" was dealing large amounts of cocaine and marijuana to individuals for distribution. The source advised that DJ drove a black Ford Expedition and a green BMW when making his drops. Source could not say where DJ lived, but knew a general area (White Ave. and Belair Rd.) where he "hung out at." Officers decided to go to that location to observe DJ. While in the area, officers saw a green BMW and followed it. The driver (Orr), a black male, parked in front of the house and opened door with a key, at which time the officers ended surveillance. On April 14, 2006 officers again set up surveillance at the house. After 30 minutes, Orr left the house and got into a BMW. The officers followed, but terminated soon after, and returned to the house. At 11:30 p.m. Orr returned to the house and the offficers approached him and identified themselves. "He

looked in their direction with a 'surprised expression' and tossed a item along with his keys next to the steps of the house." The item was recovered and found to be a plastic bag containing four smaller bags of what appeared to be crack cocaine and 3 bags of cocaine. Orr was arrested and search incident to arrest recovered a plastic bag containing multiple plastic bags with cocaine residue and $458. Orr said he lived at the house with his "girl" and two children who he didn't want "involved in his mess." "Officers were allowed inside." "Mr. Orr advised officers that they could get the rest of the items out of the location," but to just let his family stay. Orr and the girl voluntarily signed a consent to search form. Found drugs, drug paraphernalia, and ammunition.

tt.   <u>MICHAEL DIGGINS</u>:  During the second week of April, Officer Moss received information from a "reliable source" that an apartment was being used to supply drugs to street dealers. Information was gained through an April 13, 2006 arrest. While watching the apartment, Brewington, Diggins and Williams got into a car and drove away. Moss did not want to compromise his position so he stayed in place. He then left his covert location to conduct his mobile surveillance when a marked police car pulled the car over because a "tail light was out" and the driver and passenger were "not wearing their seatbelts." Moss pulled up behind and while approaching the car smelled a strong odor of suspected marijuana "coming from the vehicle." The front passengers were removed from the vehicle due to their movement and refusal to follow the officer's instructions. When the passengers got out, Moss noticed in "plain view on the floor" of the driver's side a clear plastic bag of suspected marijuana. The suspects were placed under arrest. As a "result of (his) involvement in this investigation," experience and the information received from a reliable source, applied for a search and seizure warrant. Found drugs, paraphernalia, a gun and ammunition.

uu.   <u>DESMOND JONES</u>:  On April 21, 2006 at 2:45 p.m., Officer Shields and other members of the SET "were in the area" of 100 Clinton St. and observed Desmond Jones hand Michael Bonner a clear plastic bag of suspected cocaine. Jones looked up and noticed the marked patrol car and began walking south on Clinton. Bonner also noticed the car and began running north. Officers chased Bonner and observed him "drop a clear plastic bag" containing suspected cocaine on the ground while he was running. He was apprehended and the bag was recovered and found to contain suspected cocaine. Both suspects were arrested.

vv.   CEVIS CHARLES:  On April 25, 2006 at 9:25 p.m. Officer Smith and members of the east side SET "were traveling" when they noticed a black Impala with "very dark tinted windows."  The car was pulled over to advise the driver of the violation.   As the officers approached, the front passenger (Charles) was observed once the "spotlight" from the patrol car provided light to see what was going on inside the vehicle.  Charles had his arm behind him as if digging into his pants.  The officer "in fear that he was concealing a weapon" removed the passenger from the car.  While doing so, a clear plastic bag containing several orange Ziplocs "fell to the ground," which was recovered and found to be 21 small orange Ziplocs inside of a clear plastic bag, each containing suspected cocaine.  Charles arrested and driver given a warning.

<u>Hamm's And Owens' Inadequate Response to the Conduct of the Police Officers</u>

54.   Hamm and Owens placed Harris in, and promoted him to a supervisory role in the east side SET despite their actual or constructive knowledge that Harris was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff.

55.   In addition to placing Harris in, and promoting him to a supervisory position in the east side SET, he and the other east side SET members were retained in their roles despite Hamm's and Owens' actual or constructive knowledge that the members of the SET were unfit for the tasks, duties, and responsibilities assigned to them, and that they had engaged in and were continuing to engage in acts of perjury, mishandling of evidence and egregious violations of the Constitution and the laws of the State of Maryland, and that the east side SET's conduct posed a pervasive and unreasonable risk of constitutional injury to citizens like the Plaintiff.

56.   Hamm's and Owens' retention of the SET members, and/or failure to otherwise prevent their misconduct, reveals a response to that actual or constructive

knowledge that was so inadequate as to show deliberate indifference to or tacit authorization of the conduct of the SET members.

### The Policy and "Custom and Usage" Of the BPD

57.     The policymakers of the BPD, having the final authority to establish and implement their policies, created a policy under which the Baltimore City police force was deficiently trained.  The BPD's training policy deficiencies included express and/or tacit authorizations of unconstitutional conduct as well as failures to adequately prohibit or discourage readily foreseeable unconstitutional conduct in light of the known exigencies of police duty.

58.     The unconstitutional conduct of the Police Officers and the other members of the east side SET was so widespread and persistent that it assumed the quality of the "custom or usage" of the BPD.

59.     The BCP had actual or constructive knowledge of the "custom or usage," and either specifically intended that the "custom or usage" continue, or were deliberately indifferent to stopping or correcting the unconstitutional conduct.

### V.  CAUSES OF ACTION

### COUNT I
### (The Police Officers' Violation of the Plaintiff's
### Fourth and Fourteenth Amendment Rights)

60.     The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

61.     The Plaintiff asserts Count I of this action against the Police Officers in their individual capacities.  Count I arises under 42 U.S.C. § 1983.

62.    At all times relevant to this Complaint, the Plaintiff had rights under the Fourth and Fourteenth Amendments to the United States Constitution not to have his person or property unlawfully searched, seized, detained in an unreasonable manner, not be deprived of his liberty without due process of law, and not to be summarily punished.

63.    The Police Officers' unreasonable and illegal searches of the Plaintiff's person, automobile and personal property, undertaken without a warrant, probable cause, or reasonable suspicion, deprived him of his Fourth and Fourteenth Amendment rights to be secure in his person and effects against unreasonable searches and seizures.

64.    Each of the Police Officer's actions and omissions were committed under color of state law, and were intentional, malicious, and exhibited a conscious disregard and/or reckless indifference to the Plaintiff's rights.

65.    The aforementioned actions and omissions by the Police Officers were the cause in fact and the proximate cause of the violation of the Plaintiff's constitutional rights, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

66.    As a result of the above-referenced misconduct by the Defendants, the Plaintiff has suffered and will continue to suffer:  severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; loss of personal property; and/or medical and psychological expenses.

67.    The award of punitive damages against each of the Police Officers is proper because the acts and omissions of the Police Officers were committed with evil motive or intent and/or reckless or callous indifference to the constitutional rights of the

Plaintiff and, furthermore are necessary to punish him for his misconduct, and to deter similar misconduct.

68.   WHEREFORE, the Plaintiff requests

a.   that judgment be entered in his favor against the Police Officers;

b.   that the Plaintiff be awarded compensatory damages of Ten Million Dollars against the Police Officers;

c.   that the Plaintiff be awarded punitive damages of Twenty-Five Million Dollars against the Police Officers;

d.   that the Plaintiff be awarded reasonable expenses incurred in this litigation, including reasonable attorneys and expert fees pursuant to 42 U.S.C. §1988 (b) and (c), against the Police Officers; and

e.   that the Plaintiff be awarded any other further and general relief to which it may appear he is entitled.

## COUNT II
### (The BPD's Violation of the Plaintiff's Fourth and Fourteenth Amendment Rights)

69.   The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

70.   The Plaintiff asserts Count II of this action against the BPD. Count II arises under 42 U.S.C. § 1983.

71.   As set forth more fully above, prior to the egregious acts committed upon the Plaintiff, the east side SET engaged in a pattern of unjustified, unreasonable and illegal searches and seizures, excessive force and false reporting.  The BPD recklessly

disregarded or were deliberately indifferent to the reasonable probability of constitutional harm to the Plaintiff in that:

    1.    The BPD and its as yet unknown final policymaker(s) created a policy under which their police force was deficiently trained, and which included express and tacit authorizations of unconstitutional conduct as well as failures to adequately prohibit or discourage readily foreseeable unconstitutional conduct in light of the known exigencies of police duty; and/or

    2.    The BPD had actual or constructive knowledge of a "custom or usage" which arose from the widespread and persistent unconstitutional conduct of the Police Officers and that the BPD's policymakers either specifically intended that the "custom or usage" continue, or they were deliberately indifferent to stopping or correcting it.

    72.    The aforementioned actions and omissions by the BPD were the cause in fact and the proximate cause of the violation of the Plaintiff's constitutional rights, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.  As a result of the above-referenced misconduct by the BPD, the Plaintiff has suffered and will continue to suffer:  severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; loss of personal property; and/or medical and psychological expenses.

    WHEREFORE, the Plaintiff requests

    a.    that judgment be entered in his favor against the BPD;

b.      that the Plaintiff be awarded compensatory damages of Twenty-
Five Million Dollars against the BPD;

c.      that the Plaintiff be awarded reasonable expenses incurred in this
litigation, including reasonable attorneys and expert fees pursuant
to 42 U.S.C. §1988 (b) and (c), against the BPD; and

d.      that the Plaintiff be awarded any other further and general relief to
which it may appear he is entitled.

Count III
(Hamm's and Owens' Violation of the Plaintiff's
Fourth and Fourteenth Amendment Rights)

73.     The Plaintiff realleges and incorporates herein all of the paragraphs set
forth above.

74.     The Plaintiff asserts Count III of this action against Hamm and Owens in
their individual and official capacities.  Count III arises under 42 U.S.C. § 1983.

75.     At all times relevant to this Complaint, the Plaintiff had rights under the
Fourth and Fourteenth Amendments to the United States Constitution not to have his
person or property unlawfully searched, seized, detained in an unreasonable manner, not
be deprived of his liberty without due process of law, and not to be summarily punished.

76.     Hamm and Owens placed Harris in, and promoted him to a supervisory
role in the east side SET despite their actual or constructive knowledge that Harris was
engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury
to citizens like the plaintiff.

77.     Hamm and Owens had actual or constructive knowledge that the Police
Officers were engaged in a pattern of unjustified, unreasonable and illegal searches and

seizures, excessive force and false reporting which posed a pervasive and unreasonable risk of constitutional injury to people like the Plaintiff.

78.    Hamm's and Owens' response to this knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct of the Police Officers.

79.    Hamm's and Owens' inaction was the cause in fact and the proximate cause of the violation of the Plaintiff's constitutional rights, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above. As a result of the inaction by Hamm and Owens, the Plaintiff has suffered and will continue to suffer: severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; loss of personal property; and/or medical and psychological expenses.

WHEREFORE, the Plaintiff requests

a.    that judgment be entered in his favor against Hamm and Owens;

b.    that the Plaintiff be awarded compensatory damages of Ten Million Dollars against Hamm and Owens;

c.    that the Plaintiff be awarded punitive damages of Twenty-Five Million Dollars against Hamm and Owens;

d.    that the Plaintiff be awarded reasonable expenses incurred in this litigation, including reasonable attorneys and expert fees pursuant to 42 U.S.C. §1988 (b) and (c), against Hamm and Owens; and

e.    that the Plaintiff be awarded any other further and general relief to which it may appear he is entitled.

<u>COUNT IV</u>
<u>(Violation of the Maryland Declaration of Rights Against the Police Officers)</u>

80.    The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

81.    By illegally searching and seizing the Plaintiff and his property without a warrant, the Police Officers deprived the Plaintiff of the rights, privileges and immunities guaranteed to him under Article 26 of the Maryland Declaration of Rights.

82.    The Police Officers' illegal searching and seizing of the Plaintiff and his property without a warrant by were committed with actual malice toward the Plaintiff.

83.    The aforementioned acts of the Police Officers were the direct and proximate cause of the violation of the Plaintiff's state constitutional rights, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.  As a result of the above-referenced misconduct by the Defendants, the Plaintiff has suffered and will continue to suffer:  severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; loss of personal property; and/or medical and psychological expenses.

84.    The award of punitive damages against each Police Officer is necessary to punish him for his misconduct, and to deter similar misconduct.

WHEREFORE, the Plaintiff requests

    a.    that judgment be entered in his favor against the Police Officers;

    b.    that the Plaintiff be awarded compensatory damages of Ten Million Dollars against the Police Officers;

    c.    that the Plaintiff be awarded punitive damages of Twenty-Five Million Dollars against the Police Officers;

d.   that the Plaintiff be awarded interest and costs of this action against the Police Officers; and

e.   that the Plaintiff be awarded any other further and general relief to which it may appear he is entitled.

COUNT V
(False Imprisonment -- The Police Officers)

85.   The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

86.   The conduct and actions of the Police Officers caused the Plaintiff to be unlawfully deprived of his personal liberty, by force or threat of force, without his consent, and with his knowledge.

87.   The Plaintiff's false imprisonment was executed without a warrant and was done with actual malice, demonstrating ill will, improper motivation and/or an evil purpose on the part of the Police Officers.

88.   The aforementioned actions and omissions by the Police Officers were the direct and proximate cause of the Plaintiff's physical and emotional injuries, loss of personal freedom, as set forth more fully above.

89.   As a result of the above-referenced misconduct by the Defendants, the Plaintiff has suffered and will continue to suffer:  severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; and/or medical and psychological expenses.

90.   WHEREFORE, the Plaintiff requests

a.   that judgment be entered in his favor against the Police Officers;

b.    that the Plaintiff be awarded compensatory damages of Ten Million Dollars against the Police Officers ;

c.    that the Plaintiff be awarded punitive damages of Twenty-Five Million Dollars against the Police Officers;

d.    that the Plaintiff be awarded interest and costs of this action against the Police Officers; and

e.    that the Plaintiff be awarded any other further and general relief to which it may appear he is entitled.

## COUNT VI
### (Battery – The Police Officers)

91.    The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

92.    The conduct and actions of the Police Officers constituted an intentional, nonconsensual touching of the Plaintiff's body that was harmful and offensive to him.

93.    The Police Officers' intentional, nonconsensual touching of the Plaintiff was done with actual malice, demonstrating ill will, improper motivation and/or an evil purpose.

94.    The aforementioned actions and omissions by the Police Officers were the direct and proximate cause the Plaintiff's physical and emotional injuries.

95.    As a result of the above-referenced misconduct by the Defendants, the Plaintiff has suffered and will continue to suffer:  severe physical and mental pain, suffering and emotional distress; permanent injury and disability; loss of enjoyment of life; and/or medical and psychological expenses.

WHEREFORE, the Plaintiff requests

    a.    that judgment be entered in his favor against the Police Officers;

    b.    that the Plaintiff be awarded compensatory damages of Ten Million Dollars against the Police Officers;

    c.    that the Plaintiff be awarded interest and costs of this action against the Police Officers; and

    d.    that the Plaintiff be awarded any other further and general relief to which it may appear he is entitled.

COUNT VII
(Intentional Infliction of Emotional Distress -- The Police Officers)

96.    The Plaintiff realleges and incorporates herein all of the paragraphs set forth above.

97.    The Police Officers' conduct as described herein was extreme and outrageous, beyond the bounds of decency in society and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff.

98.    The Police Officers' conduct was done with actual malice, demonstrating ill will, improper motivation and/or an evil purpose.

99.    As a result of the aforesaid acts of the Defendants, the Plaintiff has suffered and will continue to suffer severe and extreme emotional distress.

100.    WHEREFORE, the Plaintiff requests

    a.    that judgment be entered in his favor against the Police Officers;

    b.    that the Plaintiff be awarded compensatory damages of Ten Million Dollars against the Police Officers;

42

c.     that the Plaintiff be awarded punitive damages of Twenty-Five

Million Dollars against the Police Officers;

d.     that the Plaintiff be awarded interest and costs of this action

against the Police Officers; and

e.     that the Plaintiff be awarded any other further and general relief to

which it may appear he is entitled.

_____
STEVEN D. SILVERMAN
Federal Bar No.: 22887
ssilverman@mdattorney.com
ANDREW C. WHITE
Federal Bar No.: 08821
awhite@mdattorney.com
SILVERMAN THOMPSON SLUTKIN & WHITE
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201
410-385-2225

Counsel for the Plaintiff

## **DEMAND FOR JURY TRIAL**

The Plaintiff hereby demands a jury trial in this case.

_____
STEVEN D. SILVERMAN